IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:09cr134-MHT |
| FANSECO M. ROSE | ) | (WO) |

OPINION

Defendant Fanseco M. Rose pleaded guilty to one count of possession with intent to distribute a schedule I controlled substance in violation of 21 U.S.C. § 841(a)(1).  Rose filed two objections to the presentence investigation report (PSR) completed by the United States Probation Department, and he requested a 'departure' from the established base-offense level pursuant to U.S.S.G. § 5H1.6 as well as a 'variance' under 18 U.S.C. § 3553(a).

At sentencing, the court overruled both of Rose's objections to the PSR and granted his requests for a departure and a variance.  This opinion explains why.

## I. BACKGROUND

Rose is a 51-year-old resident of Lithonia, Georgia. On July 20, 2009, Rose and a friend were pulled over, by an officer for the High Intensity Drug Trafficking Area Task Force, on I-85 near Montgomery, Alabama for speeding. Rose agreed to allow the officer to search his rental vehicle.

In the search, the officer found a Glock .40 caliber semi-automatic pistol, 15 rounds of ammunition, and two plastic bags containing pills that the officer thought were MDMA (3,4-methylenedioxymethamphetamine), also known as 'ecstasy.' Rose and his friend were arrested and questioned. During the interrogation, Rose stated that the person who rented the car for him owned the gun, and Rose admitted that someone asked him to deliver the package of pills from Atlanta, Georgia to Mobile, Alabama.

Although a field test indicated that the pills were MDMA, laboratory tests revealed that they were actually BZP (Benzylpiperazine) mixed with TFMPP (N-

2

Trifluoromethylphenyl-piperazine) and caffeine. The substance weighed 587.918 grams. Neither BZP nor TFMPP is listed in the United States Sentencing Guidelines or in the drug-equivalency table. <u>See</u> U.S.S.G. § 2D1.1. Rose was indicted for possession with intent to distribute a schedule I controlled substance, 21 U.S.C. § 841(a)(1), and possession of a firearm during a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i). As stated, he pleaded guilty to the drug charge, and the government agreed to move to dismiss the firearm charge.

Prior to his sentencing hearing, Rose lodged two objections to the PSR. He also requested a departure based on loss of caretaking or financial support, U.S.S.G. § 5H1.6, and a variance under 18 U.S.C. § 3553(a).


## II. DISCUSSION

Although this court is no longer bound to follow the United States Sentencing Guidelines, <u>see</u> <u>United States v. Booker</u>, 543 U.S. 220 (2005), it still must consult the

3

Guidelines and take them into account when sentencing. See United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005); see also 18 U.S.C. §§ 3553(a)(4) & (5).  After calculating the correct guideline range, the court may impose a sentence outside that range as long as the sentence is reasonable.  See Crawford, 407 F.3d at 1179. The factors set forth in 18 U.S.C. § 3553(a) inform the court whether a sentence is reasonable.  See Booker, 543 U.S. at 263.

The court's obligation at sentencing may be summarized as follows: review the PSR (which is prepared by the Probation Department) for accuracy and rule on any objection; calculate the total-offense level and criminal-history score; rule on any upward or downward departure request; determine the final guideline range; and, finally, with the appropriate guideline range in mind, determine and impose a sentence that serves the purposes set forth in § 3553(a).[1]  Because neither the

---

1.   18 U.S.C. § 3553(a) requires courts to consider:
(continued...)

4

government nor Rose has questioned the accuracy of the
factual information listed in the PSR, the court turned
first to Rose's objections.[2]


                          A. Objections

     <u>First objection</u>: Rose objected to the Probation
Department's determination that the pills found in his
possession were most similar to MDMA for sentencing
purposes.  BZP is not listed in the drug-quantity table
or the drug-equivalency table.  See U.S.S.G. § 2D1.1(c)
& cmt. n.10(E).  Therefore, in order to calculate Rose's

_____

     1.  (...continued)
(1) the nature and circumstances of the offense; (2) the
history and characteristics of the defendant; (3) the
need for the sentence imposed to punish the offender,
protect the public from the defendant, rehabilitate the
defendant, and deter others; (4) the kinds of sentences
available; (5) the sentencing range established by the
Sentencing Guidelines; (6) any pertinent policy
statements issued by the Sentencing Commission; (7) the
need to avoid unwarranted sentence disparities among
defendants with similar records who have been found
guilty of similar conduct; and (8) the need for
restitution.

     2.  The court employed the 2009 version of the
Sentencing Guidelines.

base-offense level, the court was required to use the "marihuana equivalency of the most closely related controlled substance referenced in [the] guideline." U.S.S.G. § 2D1.1 cmt. n.5.  Rose argued that BZP is more closely related to amphetamine than it is to MDMA, and that BZP is much less potent than amphetamine.  He contended that the court should account for BZP's lesser potency when establishing the base-offense level.

In determining the most closely related controlled substance, the court is required, to the extent practicable, to consider the following:

> "(A)    Whether  the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.

> "(B)    Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic

> > effect on the central nervous
> > system of a controlled
> > substance referenced in this
> > guideline.

> > "(C) Whether a lesser or greater
> > quantity of the controlled
> > substance not referenced in
> > this guideline is needed to
> > produce a substantially similar
> > effect on the central nervous
> > system as a controlled
> > substance referenced in this
> > guideline."

U.S.S.G. § 2D1.1 cmt. n.5.

BZP's 'action' has been described as like that of both amphetamine and MDMA; it produces cardiovascular changes, including increases in heart rate and systolic blood pressure, as well as euphoria. On its own, BZP is like amphetamine in that it is a central-nervous-system stimulant, although it is ten to 20 times less potent. The pills found in Rose's possession, however, were not pure BZP, but contained a mixture of BZP, TFMPP, and caffeine. When combined with TFMPP (a hallucinogen), BZP mimics the molecular mechanism of MDMA but with a lower

7

potency; in this form, BZP-TFMPP has gained popularity as a party drug similar to that of MDMA.  Gov't's Ex. E at 45.

Because the BZP found in Rose's possession contained TFMPP, the evidence before the court suggested that MDMA, and not amphetamine, is "the most closely related controlled substance referenced in [the] guideline." U.S.S.G. § 2D1.1 cmt. n.5.  While BZP on its own may arguably be most similar to amphetamine, BZP-TFMPP is most "closely related" to MDMA, albeit less potent.  Therefore, Rose's first objection was overruled as to probation's decision to calculate the base-offense level using MDMA. Then, in determining the correct base-offense level, the court next addressed BZP-TFMPP's diminished potency.

Both the government and Rose agreed that the court may account for the potency of the drugs possessed in fashioning an appropriate sentence.  However, the government argued that the court should acknowledge BZP-

TFMPP's lesser potency with only a 18 U.S.C. § 3553(a) variance as opposed to changing the base-offense level. The court agreed with the government.  After there has been a determination of the listed drug most closely related to the unlisted drug, the Sentencing Guidelines do not provide a method to adjust the base-offense level for any potency difference remaining between the listed drug and the unlisted drug.  This potency adjustment, if warranted, may therefore be appropriately addressed as a variance.  Cf. Kimbrough v. United States, 552 U.S. 85 (2007) (holding that federal district court did not abuse its discretion by concluding that Sentencing Guidelines' crack cocaine/powder cocaine disparity yields sentence greater than necessary to achieve sentencing statute's objectives in a particular case).

Second objection:  Rose protested probation's decision to levy a two-level enhancement against him for possessing a firearm while unlawfully trafficking the BZP-TFMPP-caffeine pills.  See U.S.S.G. § 2D1.1(b)(1).  He

asserts that he did not know a firearm was in the rental car and that he never had possession over the gun. When the police officers confronted Rose with the weapon, he stated that the gun belonged to a man who rented the vehicle for him and that this man worked as a security guard. U.S.S.G. § 2D1.1 cmt. n.3 provides: "[T]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."

The court heard testimony from a law enforcement officer, as well as Rose himself, regarding the firearm. In light of the testimony and after watching a video of Rose's arrest, the court found that the enhancement should apply. While the court credited Rose's statement that the gun belonged to a man who rented the vehicle for him, the court agreed with probation and the government that it was not "clearly improbable that the weapon was connected with

the offense." U.S.S.G. § 2D1.1 cmt. n.3. The court, therefore, overruled Rose's second objection to the PSR.


## B. Departure

Rose requested a three-level departure, pursuant to U.S.S.G. § 5H1.6, based upon loss of caretaking or financial support. Section 5H1.6 explains that, "In sentencing a defendant ... family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted," but that the court may consider whether "The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family," U.S.S.G. § 5H1.6 cmt. n.1(B)(i), and whether "The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant." Id. at cmt. n.1(B)(ii).

11

Rose has been in a committed relationship with
Georgia Plummer for over 20 years.  Rose argued that he
was entitled to a departure under § 5H1.6 because he and
Plummer care for her autistic nephew, who is in his mid-
twenties.  They have been his caretakers since he was
eight-years-old, and he requires 24-hour supervision.
Rose explained that Plummer suffers from a serious medical
condition and that he was her nephew's caretaker as well
the family's main source of income before his
incarceration.  Plummer explained that, since Rose has
been incarcerated she has had to work a night shift and
pay for her nephew's care during the day.  She said that
she is in dire need of Rose's support.

Rose contended that prolonged incarceration will
cause a substantial, direct, and specific loss of
essential caretaking to his family.  <u>See</u> § 5H1.6 cmt.
n.1(B).  After hearing argument and evidence on this
issue, the court concluded that a departure was warranted.
The court credited Plummer's testimony that Rose is

12

attentive and caring towards her nephew and that he is essential in providing her nephew with quality care. Furthermore, Plummer is suffering without Rose in the home. She is working night shifts, and she is forced to spend her resources in order to find care for her nephew because Rose is not available to help. A guideline sentence would have "caused a substantial, direct, and specific loss of essential caretaking" to Rose's family. § 5H1.6 cmt. n.1(B)(i). Therefore, the court granted Rose a three-level departure based on loss of caretaking. This departure reflected the court's finding that "[t]he loss of caretaking ... substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant." § 5H1.6 cmt. n.1(B)(ii). See United States v. Spero, 382 F.3d 803, 804 (8th Cir. 2004) ("[W]e agree with the district court that Spero's family circumstances qualify as exceptional and therefore warrant granting him a downward departure. Spero is married and has four children..... One of his children ... suffers

13

from a variety of developmental disorders.  He has been diagnosed with Pervasive Developmental Disorder, mild retardation, Attention Deficit Hyperactive Disorder, obesity, and macrocephaly. His Pervasive Developmental Disorder is described by his doctor ... as an autistic spectrum disorder ....").

### C. Determining the Guideline Sentence

U.S.S.G. § 2D1.1 cmt. n.10(E) provides that one gram of MDMA is equivalent to 500 grams of marihuana. Therefore, Rose's 587.918 grams of BZP-TFMPP equaled 293.5 kilograms of marihuana.  According to the drug-quantity table, U.S.S.G. § 2D1.1(c), this quantity results in a base-offense level of 26.

From the starting point of level 26, the court further calculated Rose's offense level as follows: two levels were added because a firearm was present in the car, U.S.S.G. § 2D1.1(b)(1); two levels were subtracted because Rose qualified for the "safety valve" deduction,

14

U.S.S.G. § 2D1.1(b)(11); two levels were deducted pursuant to U.S.S.G. § 3E1.1(a) because Rose had accepted responsibility for his action; and three levels were subtracted pursuant a departure under § 5H1.6.

After these additions and deductions, Rose's offense level was 21.  Rose's criminal-history category was I, as he has zero criminal-history points.  This combination resulted in a guideline range of 37 to 46 months.

### D. A Reasonable Sentence

The court was convinced that a guideline sentence between 37 to 46 months would have been greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Rose's request for a variance was granted for the following reasons:

<u>Nature of the offense</u>: Because the diminished potency of BZP-TFMPP as compared to MDMA was not accounted for in calculating Rose's offense level, Rose was entitled to a variance under 18 U.S.C. § 3553(a).

15

In 2009, The European Monitoring Centre for Drugs and Drug Addiction released a report detailing the risks associated with BZP use.  The Monitoring Centre confirms other reports that "BZP is a [central nervous system] stimulant, but with a much lower potency (around 10% of that of d-amphetamine)," Gov't's  Ex. E at 32; however, the study does not provide a comparison in potency between BZP-TFMPP and MDMA other than explaining that BZP and TFMPP mimic "the effects of MDMA at a molecular level, but with a lower potency," id. at 48.  The Monitoring Centre cites to another study, Michael H. Baumann et al., N-Substituted Piperazines Abused by Humans Mimic the Molecular Mechanism of 3,4-Methylenedioxymethamphetamine (MDMA or 'Ecstasy'), 30 Neuropsychopharmacology, 2005, at 550-60, which explains the differences between the drugs in more detail.  In the Baumann study, scientists discovered that "BZP was about three-fold less potent than MDMA as a DA releaser in vivo, and much less potent as a 5-HT releaser."  Baumann, et al., at 554.  Furthermore,

16

the paper explains, "TFMPP is at least three-fold less potent than MDMA in its ability to stimulate release of endogenous 5-HT" and "appears less efficacious than MDMA, since the drug failed to produce large elevations in dialysate 5-HT even in high doses." Id. at 556.

While the court cannot pretend to comprehend fully the scientific language of the Baumann study, it is intrigued by the study's finding that, "At the low dose of BZP/TFMPP (3 mg/kg, i.v.), the drug mixture produced simultaneous release of DA and 5-HT that was qualitatively and quantitatively similar to the neurochemical effects produced by low-dose MDMA." Id. at 557. However, the study qualifies this finding by stating that, "In contrast to MDMA, low-dose BZP/TFMPP did not elicit robust locomotor stimulation," id.; "that BZP and TFMPP are somewhat less potent than MDMA with respect to stimulating [3H]monoamine release in vitro," id. at 555; and that "direct postsynaptic receptor actions of TFMPP undoubtedly contribute to the in vivo pharmacology of the BZP/TFMPP

mixture, resulting in behavioral effects that could be different from those produced by MDMA," id. at 558.  From this study, the court concluded that, while BZP and TFMPP are each much less potent than MDMA, the combination of the two drugs form a more powerful pill, though one that is still less potent than MDMA.

Another study conducted by the New Zealand Ministry of Health found that BZP-TFMPP, which was sold legally in the country during the time of the research, creates "very low levels of dependency."  Gov't's  Ex. D at 26. However, the study also shows that, "The adverse effects resulting from BZP/TFMPP use were severe and posed a significant potential risk to subjects ... includ[ing] anxiety, agitation, ... hallucinations ...[,] insomnia, headache, fatigue, and malaise."  Gov't's  Ex. D at 29.

Based upon the studies conducted by the Monitoring Centre,  Baumann and his colleagues, and the New Zealand Ministry of Health, the court was convinced that BZP-TFMPP is both less potent and less dangerous than MDMA.

**History and characteristics of Rose**: Rose is 51 years old and has zero criminal-history points.  He informed probation that he committed this crime out of financial desperation.  Rose has lived with his current partner for over 20 years, and, as detailed above, they have raised and cared for her autistic nephew together.  Rose informed probation that his partner, who works as a nurse, has been battling an illness that has left him as the single breadwinner in their home.  He also reported to the court that he is a chronic drinker and regular user of cocaine; Rose was willing to submit to drug and alcohol counseling.

**Need for the sentence imposed**: Rose had already spent nine months in custody awaiting sentencing.  While the court did not condone his actions, it was convinced that Rose will not likely be a repeat offender or a danger to anyone in his community upon his release.  Rose is a hardworking restauranteur and cares for his family; he did not need to be incapacitated for a lengthy period of time.  While a long sentence might have deterred others from

committing similar crimes, the court did not think the difference of a few years in prison for Rose will overly influence other individuals in deciding whether to engage in criminal conduct to the point that a variance should not be granted.

Avoiding unwarranted sentencing disparities: Offenders with similar records and backgrounds, who have been found guilty of similar conduct, should receive similar sentences. 18 U.S.C. § 3553(a)(6). Because Rose's guideline sentence did not account for the differences between BZP-TFMPP and MDMA and because of Rose's personal background and individual characteristics, the court held that a variance was necessary to ensure that he was not too harshly punished as compared to other offenders.

\* \* \*

For the reasons given above, the court sentenced Rose to a period of confinement of 24 months, followed by three years of supervised release.

DONE, this the 14th day of July, 2010.


    /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE